FILED

JUL 1 1 2018

*[signature]*

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION

| | |
|---|---|
| DAKOTA STYLE FOODS, INC.; | 1:16-CV-01036-CBK |
| Plaintiff, | |
| vs. | ORDER |
| SUNOPTA GRAINS AND FOODS, INC., | |
| Defendant. | |

## BACKGROUND

Dakota Style Foods, Inc. ("Dakota Style") filed sued against SunOpta Grains and Foods, Inc., ("SunOpta") to recover damages incurred by Dakota Style as a result of SunOpta's recall of shelled sunflower kernels. SunOpta voluntarily recalled roasted sunflower kernel products due to the potential presence of listeria monocytogenes on May 2, 2016, May 18, 2016, and May 31, 2016. The recall ultimately covered approximately one year's products sold to Dakota Style.[1] Dakota Style filed claims for strict products liability, negligence, breach of implied warranties, breach of express warranties, breach of contract, and declaratory judgment in state court. On August 12, 2016 SunOpta removed the case to federal court and on December 13, 2016 this court dismissed Dakota Style's claims for strict products liability, negligence, and declaratory judgment. SunOpta filed an answer to plaintiff's complaint, which included counterclaims for breach of sales contract, breach of contract, unjust enrichment, conversion, promissory estoppel,

---

[1] This court notes that there appears to be an inconsistency between the product recalled on the recall notices submitted by the parties and that alleged by Dakota Style in Kevin Dandurand's affidavit. The recall notices indicate that product supplied to Dakota Style between May 31, 2015, and April 20, 2016, was recalled. Kevin Dandurand's affidavit states that product was recalled between January 31, 2015, and February 1, 2016.

and fraud related to plaintiff's alleged failure to pay its outstanding balance with SunOpta or verify that product for which plaintiff was reimbursed by SunOpta was subject to recall.

On May 1, 2018, plaintiff filed a motion for partial summary judgment and defendant filed a motion for summary judgment. Plaintiff requests summary judgment for breach of contract and breach of implied and express warranties and requests that SunOpta's counterclaims be dismissed. SunOpta objects to plaintiff's request, arguing, *inter alia*, that Dakota Style has sustained no damages as the majority of product was sold to the end consumer and paid for by Dakota Style's customers, that the bulk of product delivered to Dakota Style was not contaminated by listeria monocytogenes, and that there is a factual dispute as to whether product specifications were included in the parties' contracts and whether SunOpta knew that Dakota Style used its sunflower kernels for human consumption.

Defendant requests summary judgment on Dakota Style's claim for consequential damages, Dakota Style's outstanding balance to SunOpta, the purchase price of kernel product not covered by the recall, and for the purchase price of product covered by the recall which SunOpta alleges Dakota Style already sold. Dakota Style objects to defendant's request, arguing, *inter alia*, that Dakota Style is a third-party beneficiary of SunOpta's insurance contract, that limiting damages to the purchase price is unconscionable, that Dakota Style was forced to reimburse merchants for the defective products, and that Dakota Style is entitled to set-off for its outstanding balance.

Both parties request oral argument on their summary judgment motions. Because the court is able to resolve the pending motions for summary judgment without oral argument, the requests for oral argument should be denied.

2

# DECISION

## I. Standard of Review

The purpose of summary judgment is to determine whether there is a "genuine issue for trial" with regard to a claim or defense or "part of each claim or defense." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(a). Summary judgment should be granted only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If facts are disputed, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed and "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam). However, a nonmoving party "may not rest on mere allegations or denials" and "must do more than show that there is some metaphysical doubt as to the material facts." Anderson at 256; and Matsushita at 587. Where "the factual context renders respondents' claim implausible"—for instance, "if the claim is one that simply makes no economic sense"—then "respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Matsushita at 587. In sum, an issue of fact is genuine if, based upon the evidence in the record, a reasonable jury could return a verdict for the nonmoving party. Anderson at 248.

## II. Breach of Express Warranty

This court determined in its previous ruling in this matter that South Dakota law governs

substantive issues and the UCC governs the sales contracts between Dakota Style and SunOpta.

Dakota Style Foods, Inc. v. SunOpta Grains and Foods, Inc., 2016 WL 7243534, *2 (D.S.D.

2016). Dakota Style requests that this court grant its motion for summary judgment as to breach

of express warranty. In order to recover money damages for a breach of express warranty in

South Dakota, Dakota Style must prove the following elements:

> (1) an affirmation of fact or promise made by the seller to the
> buyer relating to the goods;.
> (2) such affirmation of fact or promise became a part of the basis
> of the bargain;
> (3) that the injured party, in making the purchase, relied on the
> representations, affirmations of fact or promises;
> (4) that the goods sold by the seller failed to comply with the
> promises or affirmations of fact made by the seller;
> (5) that the buyer, because of such failure, was financially injured;
> and
> (6) that such failure to comply was a proximate cause of the
> financial injury suffered by the buyer.

Swenson v. Chevron Chemical Co., 234 N.W.2d 38, 42 (S.D. 1975) (internal citations omitted).

SDCL § 57A-2-313(1)(b) provides that "[a]ny description of the goods which is made part of the

basis of the bargain creates an express warranty that the goods shall conform to the description."

Further, "[i]t is not necessary to the creation of an express warranty that the seller use formal

words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty."

SDCL § 57A-2-313(2). As this court has previously noted, "[p]urchase agreements may

incorporate by reference another document containing technical specifications for the product,

and this will likely create an express warranty by description." James River Equip. Co. v. Beadle

Cty. Equip., Inc., 646 N.W.2d 265, 269 (S.D. 2002); Dakota Style Foods, Inc. v. SunOpta Grains

and Foods, Inc. at *5. The contracts between Dakota Style and SunOpta specifically state "[a]s

per attached product specifications." The product specification states that "[t]he product shall be manufactured in accordance with Good Manufacturing Practice 21 CFR, Part #110"; "shall conform in every respect with the provisions of the Federal Food, Drug and Cosmetic Act, as amended, and to all applicable State and Local Regulations"; and "shall meet the Kashruth requirements of the Union of Orthodox Jewish Congregations of America." The product specifications provide nutritional data, a flavor profile, and indicate that the sunflower kernels are "[n]utritionally-dense whole food."

SunOpta argues that the product specifications that Dakota Style references do not create an express warranty for two reasons: (1) that the product specifications were not included in the contracts with Dakota Style; and (2) that the product specifications disclaim any warranty through inclusion of the following statements: "This information is presented in good faith, and great care was used in its preparation. However, no warranty, guarantee, or freedom from patent infringement is implied or intended. This information is offered solely for your consideration and verification." Dakota Style, as the party having moved for summary judgment for breach of express warranty, has the burden of proving, by a preponderance of the evidence, that the product specifications were part of the parties' agreements. Dakota Foundry, Inc. v. Tromley Indus. Holdings, Inc., 737 F.3d 492, 495 (8th Cir. 2013).

## A. The Product Specifications Were Included in the Contracts with Dakota Style

It is clear to this court, given the statement in the contracts "[a]s per attached product specifications," that product specifications were part of the contracts. This is consistent with the fact that virtually no description of the products Dakota Style purchased are included in the sales contracts. SunOpta, however, argues that there is a factual issue as to whether the product specifications were provided to Dakota Style as part of the contract, stating that

> Michael Todd, the SunOpta employee who negotiated the sunflower contracts with Dakota Style, testified he did not believe he included the product specifications when he sent contracts to Dakota Style, and even stated he looked back at emails to see if he had, and no emails substantiated that product specifications were sent with the contracts.

Michael Todd also stated via affidavit that "SunOpta does not make its product specifications generally available to the public." The contracts themselves, two of which were finalized just over a year before the initiation of this dispute, are hand signed and include a provision requesting that the signed copy be returned to SunOpta. SunOpta is uniquely in possession and control of these documents; yet, it has failed to submit any evidence that other specifications were provided to Dakota Style, that Dakota Style was provided or may have otherwise obtained the specifications exclusive of the contract negotiations, or that its files in fact contain no product specifications and the reference included in the contracts was in error. It is immaterial that Dakota Style's Vice President, Riley Dandurand, was unable, at deposition, to remember the exact date that the product specifications were received when he was nonetheless able to specify that "when we would enter a contract we would get [the product specifications] from SunOpta's . . . QA or quality control department."

SunOpta must do more than "show there is some metaphysical doubt" as to the incorporation of product specifications in its contracts with Dakota Style. Matsushita at 587. Moreover, because this court finds that it is implausible that product specifications would not have been included in the contracts, that Dakota Style would have had such product specifications absent their inclusion in the contracts, and that SunOpta would not be able to dispute the specifications Dakota Style provides, SunOpta must "come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Id. No reasonable jury could return a verdict for SunOpta, based on the evidence that it has provided, that the

product specifications provided by Dakota Style were not included in the contracts. As such, this matter is not a genuine issue of fact that must be preserved for trial. This court therefore finds that the product specifications serve as an express warranty pursuant to SDCL § 57A-2-313(1)(b).

## B. SunOpta's Purported Disclaimer of Express Warranty is Inoperative

SunOpta claims that a statement included on its product specifications disclaims any warranty that might arise as a result of those specifications. SDCL § 57A-2-316(1) states that

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (§ 57A-2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Comment 4 to SDCL § 57A-2-313 clarifies this rule by explaining that

> In view of the principle that the whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell . . . [a] clause generally disclaiming 'all warranties, express or implied' cannot reduce the seller's obligation with respect to such description and therefore cannot be given literal effect under Section 2-316. This is not intended to mean that the parties, if they consciously desire, cannot make their own bargain as they wish. But in determining what they have agreed upon good faith is a factor and consideration should be given to the fact that the probability is small that a real price is intended to be exchanged for a pseudo-obligation.

While the UCC provides for the possibility of disclaimers of express warranties, then, it also acknowledges that at once including and disclaiming express warranties may be illogical and that a seller cannot therefore use a general clause to "reduce [its] obligation with respect to such description." It is a basic principle of contract law that, where there is a conflict between specific and general provisions of a written contract, the specific provisions prevail. *See, e.g.*, Bunkers v. Jacobsen, 653 N.W.2d 732, 738 (S.D. 2002). Further, "[d]isclaimers of warranty are to be strictly

construed against the seller." James River Equip. Co. v. Beadle Cty. Equip., Inc., 646 N.W.2d 265, 270 (S.D. 2002) (internal citations omitted). This court acknowledges the possibility that SunOpta used its product specifications both to provide information to potential purchasers and as technical specifications for executed contracts. When these specifications are incorporated by reference into a given contract, such as those with Dakota Style, rather than serving to inform a potential customer, the specifications become an express warranty of the contract, as articulated above. It would be unjust, when those specifications function as an express warranty, to allow SunOpta to escape its obligation with regard to them. For these reasons, this court finds that there is no reasonable interpretation of the disclaimer such that both the product specifications and disclaimer remain operative; because the product description is specific, and the disclaimer is general, in construing the disclaimer against the seller effect must be given to the product description as the express warranty.

SunOpta does not otherwise dispute that Dakota Style has demonstrated that SunOpta (1) made an affirmation of fact relating to the sunflower kernels, (2) that such affirmation of fact became part of the basis of the bargain, or (3) that Dakota Style, in making the purchase, relied on such representations of fact, as required by the first three elements of a claim for breach of express warranty. However, SunOpta does dispute that it breached an express warranty for 96.3% of the product that it sold to Dakota Style, that Dakota Style suffered the financial injury that it claims, and that SunOpta was the proximate cause of Dakota Style's damages. The court finds that there are genuine factual disputes with respect to Dakota Style's financial injury, and, as such, that summary judgment for breach of express warranty at this juncture should be denied.

## C. Dakota Style Need Not Demonstrate Actual Contamination of Recalled Product

SunOpta argues that there is no evidence that 96.3% of the product that it recalled was in fact contaminated with listeria monocytogenes. Only one lot of sunflower kernel provided to Dakota Style and ultimately recalled, SunOpta states, tested positive for listeria monocytogenes. SunOpta argues, relying on a District of Minnesota case applying Minnesota law, that to succeed on a warranty claim in the event of a food recall, the plaintiff has the burden of showing that the recalled product was actually contaminated or defective. The case SunOpta relies on, General Mills Operations, LLC v. Five Star Custom Foods, Ltd., granted General Mills damages in breach of contract following a recall of beef Five Star sold to General Mills and which was incorporated as meatballs into General Mills' canned soups. 789 F.Supp.2d 1148 (D. Minn. May 20, 2011). The court dismissed General Mills' breach of express and implied warranties claims, holding that General Mills must show evidence of actual manifestation of a defect in the products for which it claimed damages; General Mills only demonstrated, however, that the meat recalled and incorporated into its products may have been contaminated as a result of the recall. *Id.* at 1154-55. On appeal, the Eighth Circuit declined to address the breach of warranty argument, holding that the award of damages to General Mills on breach of contract was proper, and that "[t]his court makes no statement on the accuracy of the [breach of warranty] ruling," as any argument challenging that ruling was therefore rendered moot. General Mills Operations, LLC v. Five Star Custom Foods, Ltd., 703 F.3d 1104, 1112 (8th Cir. 2013).

The district court's decision in General Mills relies on Eighth Circuit precedent regarding the requirement to demonstrate a defect in claims for breach of express or implied warranties: Cooperative Power Ass'n v. Westinghouse Elec. Corp., 60 F.3d 1336 (8th Cir. 1995); Briehl v. General Motors Corp., 172 F.3d 623 (8th Cir. 1999); and O'Neil v. Simplicity, Inc., 574 F.3d 501

(8th Cir. 2009). None of these cases interpret or apply South Dakota law, the substantive law governing this case, and this court notes that the requirement to demonstrate breach of express warranties in South Dakota requires proof "that the goods sold by the seller failed to comply with the promises or affirmations of fact made by the seller" which may be "inferred from proof that the product did not perform as intended by the manufacturer." Swenson v. Chevron Chemical Co. at 503; and Drier v. Perfection, Inc., 259 N.W.2d 496, 504 (S.D. 1977); Plaintiffs "are not required to offer direct evidence of a defect." Schmaltz v. Nissen, 431 N.W.2d 657, 663 (S.D. 1988). This fact notwithstanding, existing precedent requiring demonstration of a defect may be distinguished.

Of the cases that the district court in General Mills relies on, O'Neil v. Simplicity, Inc. is closest in alignment with the current dispute. O'Neil relies on a reading of Briehl that is analyzed in greater detail below. In Cooperative Power Ass'n v. Westinghouse Elec. Corp., the jury found that there was no defect in an electrical transformer sold by Westinghouse to Cooperative Power Association where Cooperative Power Association was unable to demonstrate that a transformer malfunction was related to a defect in its production, rather than installation of its component parts. Unlike the dispute at hand, Cooperative Power concerned a single transformer and did not address product recalls. In Briehl v. General Motors Corp., SUV owners brought a class action against General Motors alleging that the new anti-lock braking system General Motors installed on its SUVs did not perform as the owners expected, even though the system performed as designed. The court held that the plaintiffs were unable to demonstrate that the brakes were in fact defective, as indeed they were not, and that the plaintiffs did not adequately plead any damages suffered. No product recall was at issue in Briehl, nor was it clear that any of the plaintiffs had suffered harm.

In contrast, in O'Neil v. Simplicity, Inc., a group of consumers brought a class action lawsuit against a manufacturer that had recalled cribs designed with a faulty drop-side opening.

The cribs caused three infant deaths and other non-fatal injuries and incidents. The manufacturer, rather than refund the price of the cribs or repair the hardware, offered to mail a repair kit to customers upon request. Applying Minnesota law, the district court held that the plaintiffs' claims for breach of implied warranty failed because plaintiffs were unable to demonstrate that the defect for which the cribs were recalled was in fact present in the cribs plaintiffs owned. In dismissing plaintiffs' appeal, the Eighth Circuit relied on Briehl: "Where, as in this case, a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." O'Neil v. Simplicity, Inc. at 504 (internal citation omitted). The court also dismissed plaintiffs' attempt to distinguish Briehl, stating that the fact that the product at issue in Briehl was not actually defective was immaterial, since plaintiffs' allegation in Briehl that their vehicles "suffer from defects" was taken as true. While the Eighth Circuit's clarification of Briehl may have been sufficient to address the plaintiffs' claims in O'Neil, it is not clear that it captures differences between Briehl and O'Neil that are material to this case.

The decision in Briehl turns on the fact that plaintiffs were unable to establish that they had suffered any damages, noting that "[t]he Plaintiffs' ABS brakes have functioned satisfactorily and at no time have the brakes exhibited a defect" and that "[a] reasonable inspection of the driving characteristics of an ABS-equipped vehicle will reveal the tendencies of ABS braking." Briehl v. General Motors Corp. at 627, 626. The Eighth Circuit may have just as easily written that plaintiffs' ABS brakes functioned satisfactorily in spite of the tendencies of ABS braking, and that no harm occurred as a result of those tendencies causing an accident. Indeed, this is in line with the characterization of Briehl by the Fifth Circuit, also cited by O'Neil. Cole v. General Motors Corp., 484 F.3d 717, 729 (5th Cir. 2007) (stating that "[t]he Eighth Circuit held that the plaintiffs had no cognizable claims for breach of express and implied warranties—or under any other

theory—where the braking systems had never malfunctioned or failed"). The Eighth Circuit's argument in <u>Briehl</u>, then, is that the anti-lock braking system does not constitute a defect because plaintiffs cannot demonstrate that it resulted in any damages. What the Eighth Circuit decision in <u>O'Neil</u> does not address is that the objective increased risk established by the product recall of cribs known to have caused harm is categorically different than potential damages it previously characterized as "simply too speculative to allow [<u>Briehl</u>] to go forward." <u>Briehl v. General Motors Corp.</u> at 629. That is, the Eighth Circuit does not acknowledge in O'Neil the unique evidentiary aspects of a product recall.

It is possible to distinguish <u>O'Neil</u> from the current case on other grounds. As noted above, <u>O'Neil</u> applies Minnesota law, rather than South Dakota law. <u>O'Neil</u> also involved a class action lawsuit brought by end consumers, rather than distributors. Finally, <u>O'Neil</u> concerned a product recall of children's furniture, not consumables.

As preliminary observations, product recalls present circumstances and considerations that are different from those at issue in a products liability action, such as that brought in <u>Cooperative Power</u>, in which a single product fails with no harm likely to result from that failure. The initiation of a product recall is regulated by a government agency, whether the US Department of Agriculture, Food and Drug Administration, National Highway Traffic Safety Administration, or Consumer Product Safety Commission. Certain aspects of product recalls for food items persuade this court that food recalls are further unique. Not all consumers purchase cribs or drive an SUV, but everyone purchases food. Moreover, the financial impact of food product recalls is significant: the Grocery Manufacturers Association reported in 2011 that 52% of its members estimated sales losses and direct recall losses resulting from food recalls at between $10 to $100 million or greater. *Capturing Recall Costs*, GMA, Covington & Burling LLP, and Ernst & Young, 3 (2011). The cost

of food borne illnesses in the US—which may be linked to products not recalled and other failures in the supply chain—is estimated at between $55.5 and $93.2 billion annually. Robert Scharff, *State estimates for the annual cost of foodborne illness*, 78 J. FOOD PROTECTION 1064, 1064 (2015). The centrality of food products to the US economy and their regulation by multiple federal agencies suggests that serious consideration should be given to the treatment of product recalls in this sector.

Unlike children's products or vehicles, food spoils. Requiring that food be tested to demonstrate actual contamination necessitates that it be stored in an appropriate environment during testing, potentially increasing the cost of a recall. Testing a product to demonstrate that it is contaminated may require testing a significant amount of product, as pathogens may not spread evenly throughout a product, requiring a large sampling program. *See, e.g.*, Beth Kowitt, *Why Our Food Keeps Making Us Sick*, FORTUNE (May 6, 2016) (*quoting* Associate Professor of Food Safety at North Carolina State University, Ben Chapman: "[i]f you take a whole bunch of lettuce heads off a truck and test one out of 100, you still might not find a problem because it's not likely to be spread evenly"). The Eighth Circuit could not have intended this outcome. To create a rule that would require a plaintiff in a food product recall case to incur disproportionate costs in order to demonstrate an actual defect is contrary to public policy. If actual manifestation of contamination were required to prove a defect, courts may incentivize entities in the food chain distribution to delay the process of recall to focus on whether reimbursement for recalled product will be forthcoming. As such, the recall itself, conducted pursuant to regulatory guidelines, should serve as sufficient evidence of defect required to demonstrate a breach of express or implied warranty.

Not all jurisdictions require the demonstration of a defect for a successful breach of express or implied warranty claim. *See, e.g.*, <u>In re Bridgestone/Firestone, Inc.</u>, 155 F.Supp.2d

1069, 1099-1101 (S.D. Ind. 2001) (*rev'd on other grounds* 288 F.3d 1012 (7th Cir.2002)); *see also* Cole v. General Motors Corp. at 729 (stating, in the context of recovery under a vehicle warranty, that "it is not clear that the actual manifestation of a vehicle defect is a common prerequisite for recovery under warranty law in all jurisdictions"). To recover for breach of warranty in South Dakota, "[n]o specific defect need be shown if the evidence, direct or circumstantial, permits the inference that the problem was caused by a defect." Drier v. Perfection, Inc. at 504. In light of South Dakota law, and following a line of cases decided in the Sixth Circuit, this court holds that, where food product recalls are at issue, the recall notice serves as evidence of an increased risk of injury, and that such increased risk constitutes a defect, regardless of whether the risk manifests itself. *See* In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation, 722 F.3d 838 (6th Cir. 2013); and Storey v. Attends Healthcare Products Inc., 2016 WL 3125210 (E.D. Mich. 2016).

Given that Dakota Style is not required to provide direct evidence of a defect in a breach of express warranty claim and that, moreover, the recall itself would serve as evidence of such a defect, Dakota Style must still demonstrate that "the goods sold by the seller failed to comply with the promises or affirmations of fact made by the seller." This court is persuaded that product that is recalled due to potential contamination with listeria monocytogenes does not meet the requirements outlined in the product specifications that "[t]he product shall be manufactured in accordance with Good Manufacturing Practice 21 CFR, Part #110"; "shall conform in every respect with the provisions of the Federal Food, Drug and Cosmetic Act, as amended, and to all applicable State and Local Regulations"; "shall meet the Kashruth requirements of the Union of Orthodox Jewish Congregations of America"; or that the product is a "[n]utritionally-dense whole food." As Dakota Style has articulated, 21 CFR § 110 requires process controls that prevent food

contamination. 21 CFR § 110.40, § 110.80. That SunOpta was not cited for such violations by the FDA is not dispositive of the fact that the goods sold failed to comply with the seller's affirmations. SunOpta itself states that product contaminated with listeria monocytogenes is "adulterated" in violation of the Federal Food, Drug and Cosmetic Act. 21 U.S.C. § 342(a)(1). SunOpta's claim that it did not breach an express warranty for 96.3% of the product supplied to Dakota Style thus fails to the extent that such product was in fact recalled by SunOpta, regardless of whether Dakota Style tested such product for contamination. That is, the goods sold by SunOpta to Dakota Style and then recalled failed to comply with the affirmations of fact made by SunOpta and memorialized in the product specifications, satisfying element (4) of a claim for breach of express warranty. Swenson v. Chevron Chemical Co. at 503.

### D. Questions of Fact as to the Extent of Dakota Style's Financial Injury Remain

SunOpta also disputes that Dakota Style suffered the financial injury that it claims. SunOpta alleges that the majority of product for which Dakota Style claims damages was ultimately purchased by end consumers and that Dakota Style received payment for such products. Dakota Style, however, states that although it did receive initial payments from its customers of $1,495,681 for a portion of the recalled product it sold, its customers required Dakota Style to refund that purchase price, in addition to charging Dakota Style additional expenses related to the recall. Dakota Style further maintains that it paid SunOpta $1,755,600 for sunflower kernel product, a sum that SunOpta disputes as reflecting Dakota Style's mark-up to consumers and product that was not recalled. There is a contested question of fact, then, as to whether Dakota Style was financially injured and to what extent as a result of SunOpta's failure to comply with the product's express warranties. For this reason, summary judgment as to breach of express warranty should be denied.

## E. Questions of Fact as to the Cause of Dakota Style's Financial Injury Remain

SunOpta also disputes that it was the proximate cause of Dakota Style's damages. Dakota Style alleges that its contracts with consumers penalize Dakota Style for a product recall by charging a fee in the event of recall and by requiring that Dakota Style products beyond the recall be removed from store shelves. The scope of the damages Dakota Style suffered as a result of such contract provisions with its consumers is unclear from its briefs. As such, there is an issue of material fact as to whether SunOpta's failure to comply with its express warranties was a proximate cause of all the financial injury that Dakota Style claims it suffered.

## III. Breach of Implied Warranty of Fitness for a Particular Purpose

Dakota Style also requests summary judgment as to its claim of breach of implied warranty of fitness for a particular purpose. SDCL § 57A-2-315 states that

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under § 57A-2-316 an implied warranty that the goods shall be fit for such purpose.

Implied warranties are obligations created by law and "enforced under the form of a contract." Virchow v. Univ. Homes, Inc., 699 N.W.2d 499, 505 (S.D. 2005). As an obligation arising under contract, "[p]roof of the breach of an implied warranty is sufficient to justify recovery irrespective of fault or negligence of the seller." Waggoner v. Midwestern Development, Inc., 154 N.W.2d 803, 807 (S.D. 1967). The following must be in evidence for an implied warranty of fitness for a particular purpose to be found:

> 1. The seller must have reason to know the buyer's particular purpose.
> 2. The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.
> 3. The buyer must, in fact, rely upon the seller's skill or judgment.

Diamond Surface, Inc. v. State Cement Plant Com'n, 583 N.W.2d 155, 162 (S.D. 1998). A seller "must deliver a product that is fit for the purpose for which it is intended" where an implied warranty of fitness for a particular purpose is created. Virchow v. Univ. Homes, Inc. at 505. A party asserting a violation of the warranty of fitness for a particular purpose "must present sufficient evidence, direct or circumstantial, to permit the inference that the product was defective when it left the manufacturer's possession or control." Id. at 506.

Dakota Style claims that SunOpta breached the implied warranty of fitness for a particular purpose by distributing product containing listeria monocytogenes when SunOpta knew that the product would be distributed and sold for human consumption. Dakota Style states that SunOpta provided Dakota Style with market research showing Dakota Style's relative ranking in the sunflower seed market and forwarded to Dakota Style a photograph of SunOpta employees in front of its product. The two companies also discussed Dakota Style's sales to Walmart. SunOpta claims that it was not on notice that Dakota Style intended to use its product for human consumption, that evidence of actual adulteration is necessary to prove that it breached this warranty, and that there is a question of fact as to whether Dakota Style relied on SunOpta's judgment in furnishing the appropriate goods. As with breach of express warranty, this court holds that the recall notice itself serves as evidence of adulteration of the product.

SunOpta's only evidence that it did not know that Dakota Style, registered as Dakota Style Foods, Inc., used its product for food is the testimony of Michael Todd that "I don't know what our customers are doing with the product" and testimony of Lisa Robinson, Vice President of Food Safety and Quality Assurance, that she does not know of any use of sunflower kernels produced by SunOpta outside of the human food chain. Presumably, Dakota Style could use sunflower seeds for bird seed or other animal food products. However, in his affidavit in opposition to Dakota

Style's motion for summary judgment, Michael Todd referred to the product SunOpta supplied Dakota Style as "nut snacks." During deposition, Michael Todd notes that the sunflower kernels may be flavored dill, ranch, barbecue, salt and pepper, or honey, agreeing that the product is seasoned depending on what Dakota Style has ordered. According to a deposition that SunOpta presents on its behalf, Riley Dandurand stated that Dakota Style's relationship with SunOpta, then known as Dahlgren's, existed as early as the mid-1990s, and that SunOpta packaged sunflower seeds for Dakota Style until Dakota Style began doing so itself in 2012. The product specifications included with the contracts indicate that the sunflower kernels are a "[n]utritionally dense food" and identify the sunflower seeds as "savory bacon," "BBQ," "dill pickle," "honey roasted," "ranch," and "salt and pepper." It is clear to this court, then, that SunOpta knew that Dakota Style used its sunflower kernels for human consumption. There is no reason bird seed would be flavored barbecue. The factual context, in this instance, renders SunOpta's claim totally implausible, and SunOpta has failed to do more than rest on its allegation that there is some metaphysical doubt as to whether it knew that the sunflower kernels were used for human consumption.

Moreover, because SunOpta provided product specifications for the sunflower seeds in its contracts with Dakota Style and flavored its products depending on Dakota Style's request, it is apparent to this court that SunOpta knew that Dakota Style relied on it to produce sunflower kernels fit for human consumption, and that Dakota Style would so rely. While the elements of breach of implied warranty of fitness for a particular purpose are then met, Dakota Style should nonetheless not be granted summary judgment on this issue. The same factual questions regarding financial injury as adhere to the breach of express warranty claim apply here. As the breach of an implied warranty sounds in contract, any action for such breach requires proof of damages. *See, e.g.*, Waggoner v. Midwestern Development, Inc. at 807; Morris, Inc. v. State, ex rel. State Dept.

of Transp., 806 N.W.2d 894, 903 (S.D. 2011). Since there remains a dispute as to the extent of damages suffered by Dakota Style, summary judgment should not be granted for breach of an implied warranty of fitness for a particular purpose.

## IV. Breach of Implied Warranty of Merchantability

Dakota Style requests that this court enter summary judgment as to its claim of breach of implied warranty of merchantability. SDCL § 57A-2-314 states that, unless excluded or modified, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Merchantable goods must be those that, at a minimum,

> (a) Pass without objection in the trade under the contract description; and
> (b) In the case of fungible goods, are of fair average quality within the description; and
> (c) Are fit for the ordinary purposes for which such goods are used; and
> (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved . . . .

SDCL § 57A-2-314. Dakota Style argues that SunOpta's product was not merchantable because it did not pass without objection in the trade under the contract description, was not of fair average quality within the description, was not fit for the ordinary purpose for which such goods are used, and did not run within the variations of the parties' contracts. SunOpta argues that, because Dakota Style has not provided evidence that the product was defective, this claim should fail. SunOpta also argues that the recalled product was merchantable at the time it was sold and that Dakota Style had already sold to its customers product covered by the recall.

As support for its argument, SunOpta cites a District of South Dakota case applying South Dakota law, Lindholm v. BMW of N. Am., LLC. 202 F. Supp. 3d 1082 (D.S.D. 2016), aff'd, 862

F.3d 648 (8th Cir. 2017). This court disagrees with SunOpta's comparison of Lindholm to the current case. In Lindholm, the District Court dismissed the plaintiff's implied warranty claims where the plaintiff's misuse of a car jack resulted in his death. Misuse or abnormal use of a product is a common defense to the applicability of the implied warranties. *See, e.g.,* Diamond Surface at 163; Roderick J. Mortimer, *Cause of Action for Economic Loss Resulting from Breach of Implied Warranty of Merchantability Under UCC § 2-314*, 11 CAUSES OF ACTION 531 § 12 (May 2018). The Eighth Circuit affirmed, stating that plaintiff's contributory negligence "was quite clearly the primary cause of the accident." Lindholm v. BMW of N. Am., LLC, 862 F.3d 648, 653 (8th Cir. 2017). Dakota Style's contributory negligence for contaminating the sunflower kernels is not alleged here. As above, the evidence of the recall itself and increased risk of contamination demonstrate that the product SunOpta provided to Dakota Style was defective.

Comment 1 to SDCL § 57A-2-314 makes clear that the seller's obligation "applies to present sales." SunOpta claims that, because Dakota Style sold the recalled product to its customers prior to the recall, the product was merchantable at the time of sale. This is a novel argument. However, the recall itself refutes SunOpta's argument, as the contamination for which the sunflower kernels were recalled was extant when those kernels left SunOpta's control, at the time of sale to Dakota Style. Nonetheless, summary judgment of the implied warranty of merchantability at this juncture should not be granted, since there remains a dispute as to the extent of damages suffered by Dakota Style.

**V. Breach of Contract**

Dakota Style requests summary judgment on its claim for breach of contract, stating that SunOpta "breached its promise to supply Dakota Style with sunflower kernels that were manufactured in accordance with Good Manufacturing Practice 21 CFR, Part #110 and

conformed in every respect with the provisions of the Federal Food, Drug and Cosmetic Act" as required by the product specifications. Dakota Style's breach of contract claim includes breach for the failure of SunOpta to supply all product agreed to in the parties' requirements contract after product was recalled. SunOpta states that Dakota Style is not entitled to summary judgment on its breach of contract claim because (1) SunOpta breached no promise, as it disputes that the product specifications were incorporated into the contract; (2) Dakota Style suffered no damages; and (3) Dakota Style has not provided evidence of defect for the majority of product for which it requests damages. This court has already addressed issues (1) and (3). In order to sustain a claim for breach of contract, a party must provide "proof of an enforceable promise, its breach, and damages." Morris, Inc. v. State, ex rel. State Dept. of Transp. at 903 (*quoting* McKie v. Hutley, 620 N.W.2d 599, 603 (S.D. 2000)). However, where one party is injured from another's breach of contract, the injured party has a duty to mitigate avoidable damages. *See, e.g.*, Ducheneaux v. Miller, 488 N.W.2d 902, 917 (S.D. 1992). This court agrees that there is a dispute as to the extent of damages Dakota Style sustained and whether Dakota Style made reasonable efforts to mitigate its damages; as such, summary judgment on this issue should not be granted.

## VI. Dakota Style's Request for Consequential Damages

SunOpta requests this court grant it summary judgment on Dakota Style's claims for consequential damages and other damages beyond the purchase price of the recalled product. SunOpta notes that the parties' contracts include a limitation of liability clause limiting damages to the purchase price of the product. Dakota Style argues that the limitation of liability clause is unconscionable. The parties do not dispute that the following provision is included in their contracts: "The SUNOPTA GRAINS AND FOOD GROUP liability, whether contractual or

otherwise, is exclusively limited to the purchase price of the product under all circumstances and regardless of the nature, cause or extent of the loss."

Under South Dakota law, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." § SDCL 57A-2-719. The issue of unconscionability is a matter of law to be determined by the trial court. § SDCL 57A-2-302(1); Johnson v. John Deere, 306 N.W.2d 231, 236 (S.D. 1981). Each party must be given the opportunity to present evidence "as to [the contract's] commercial setting, purpose and effect to aid the Court in making the determination." § SDCL 57A-2-302(2). A court is not required to hold a formal hearing where "all possible evidence is already in the record." Golden Reward Min. Co. v. Jervis B. Webb Co., 722 F.Supp. 1118, 1121 (D.S.D. 1991) (*quoting* Herrick v. Monsanto Co., 874 F.2d 594, 597 (8th Cir.1989)). Unconscionability is "a determination to be made in light of a variety of factors not unifiable into a formula." Johnson v. John Deere at 236. "One-sided agreements whereby one party is left without a remedy for another party's breach are oppressive and should be declared unconscionable." Durham v. Ciba-Geigy Corp., 315 N.W.2d 696, 700 (S.D. 1982) (internal citations omitted); *see also* Braun v. E.I. du Pont De Nemours and Co., 2006 WL 290552 (D.S.D. 2006) (discussing the unconscionability provisions in the UCC and holding that Durham remains good law in South Dakota). When determining whether a contract is unconscionable, courts focus on "both overly harsh or one-sided terms, i.e., substantive unconscionability[,] and how the contract was made (which includes whether there was a meaningful choice), i.e., procedural unconscionability." Nygaard v. Sioux Valley Hospitals & Health System, 731 N.W.2d 184, 195 (S.D. 2007) (internal citations omitted).

A limitation of liability clause in a contract between sophisticated business entities, as in the current dispute, may be procedurally unconscionable where a seller uses its superior

bargaining power to limit negotiation and unfair surprise is at play. <u>Golden Reward Min. Co. v.</u>

<u>Jervis B. Webb Co.</u> at n.16 (*citing* <u>Contruction Assoc. Inc. v. Fargo Water Equip. Co.</u>, 446

N.W.2d 237 (N.D. 1989) (applying North Dakota law)). Dakota Style concedes that it could have

sourced its sunflower kernels from another company at the time it contracted with SunOpta, and

therefore had a meaningful choice as to suppliers. Determining that a contract provision between

business entities is substantively unconscionable is extremely rare. Where, as here, SunOpta has

the power to recall product repeatedly—approximately one year of Dakota Style's inventory in

the instant case—SunOpta effectively has the latitude to render the distributors with which it

does business unprofitable. It strikes this court that such a limitation of liability clause in a

contract may be substantively unconscionable in the case of product recalls. The extent to which

recall liability insurance is available to cover the costs incurred by Dakota Style is also unclear,

in spite of SunOpta's argument to the contrary.[2] The court has not heard all evidence as to the

commercial setting, purpose and effect of the contracts at issue. As such, SunOpta's request for

summary judgment on consequential damages should be denied.

---

[2] The 2012 Farm Bill included a provision directing the USDA to study the feasibility of a crop insurance product that covers a producer's losses after a food safety recall occurs for specialty products. Study of Food Safety Insurance, Agriculture Reform, Food, and Jobs Act of 2012, 7 U.S.C. 1522(c)(22). The report was commissioned in light of the fact that, when recalls happen, "consumers stop purchasing the product regardless of what farm the food came from" and "producers suffer major financial losses because of a recall that they did not cause." S.Amdt.2309 to S.3240, Agriculture Reform, Food, and Jobs Act of 2012 (statement of Sen. Dianne Feinstein). The report itself, which focused on recall crop insurance, noted that one stakeholder "indicated that producer interest was higher for recall liability insurance (i.e. responsibility for damages incurred by other parties) than for recall crop (yield or revenue) insurance." Research Report for the Study of Food Safety, W&A Crop Insurance Division, Contract No. GS10F0155P, Order No. D14PD01117 1 (Jan. 30, 2015). Stating that recall liability insurance was outside of the scope of the study, the report did not cover this topic in any greater detail. Recall coverage itself "is a relatively new and evolving insurance product" that historically has been held by "a relatively small minority of food companies." Jonathan M. Cohen, *Managing the Financial Risks of Changes in the Regulation of Food Manufacturing and Distribution*, ASPATORE *5 (Nov. 2012). Smaller food companies may be at a disadvantage in managing the financial risks of product recalls. For instance, smaller food companies may be required to provide indemnification to larger companies with which they contract "because larger companies often refuse to do business absent such indemnification" but find that these indemnities "are often far broader than the insurance a company might have." *Id.* at *2-*3. There are questions of fact, then, as to whether Dakota Style could have insured against the losses it sustained as a result of SunOpta's recall.

Dakota Style also claims that it should not be limited to recover the purchase price of the recalled product because, in directing Dakota Style to its insurance claims process, SunOpta modified the contract as "[t]here is no evidence that [insurance] coverage was limited to the refund of the purchase price." Dakota Style further argues that it is a third-party beneficiary to SunOpta's insurance contract. Dakota Style is not listed as an additional insured of SunOpta's insurance on copies of the insurance policies filed by Dakota Style. Nor has Dakota Style indicated that it was the intent of SunOpta and its insurer to enter into the insurance contract to benefit Dakota Style, as is required under South Dakota law. Jennings v. Rapid City Regional Hosp., Inc., 802 N.W.2d 918, 921 (S.D. 2011) (internal citations omitted). Intent is first determined by "look[ing] at the language of the contract." *Id.* "The terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member." *Id.* at 922. Dakota Style has made no argument at this point that intent to benefit it or SunOpta's distributors is indicated in the insurance contracts. This court further finds no merit in the argument that purchase of insurance modifies a separate contract between two parties. Dakota Style essentially argues that SunOpta unilaterally modified the parties' contracts; however, "modification of a contract cannot be effected by the sole action of one of the parties to it." Ahlers Bldg. Supply, Inc. v. Larsen, 535 N.W.2d 431, 435 (S.D. 1995). Dakota Style provides no evidence that the parties mutually agreed to SunOpta's purchase of insurance.

## VII. Dakota Style's Request for the Purchase Price of Kernel Product Not Recalled

Dakota Style argues that it should receive reimbursement for products not recalled that were nonetheless removed from its customers' shelves as a result of SunOpta's recall. These damages may be characterized as consequential damages. Consequential damages are those that "do not flow directly and immediately from an injurious act but that result indirectly from the

24

act." *Damages*, BLACK'S LAW DICTIONARY (10th Ed. 2014). As this court declines to grant SunOpta's request for summary judgment as to consequential damages, the court should also refrain from granting SunOpta's request for summary judgment for the purchase price of kernel product not recalled.

## VIII. Dakota Style's Request for the Purchase Price of Kernel Product Recalled

As outlined in Part II, Sections D and E above, SunOpta claims that Dakota Style's request for the purchase price of kernel recalled reflects Dakota Style's mark-up to consumers and that Dakota Style has already received payment for the recalled product from its customers. Dakota Style disputes this claim, stating that its customers required that it refund their purchase prices for the product. As there are contested questions of fact regarding the extent to which Dakota Style was financially injured following SunOpta's recall, summary judgment on this issue is not appropriate. However, this court notes that the inapplicability of the collateral source rule to this claim is not as clear as SunOpta alleges. *See, e.g.*, Joseph M. Perillo, *The Collateral Source Rule in Contract Cases*, 46 SAN DIEGO L. REV. 705 (August/September 2009).

## IX. Dakota Style's Unpaid Balance

SunOpta requests the court enter summary judgment for Dakota Style's outstanding balance of $641,083.92 of product received, to include a late charge of 1.5% per month for payments not made within 45 days. Dakota Style also requests that this court enter summary judgment on SunOpta's claims of breach of sales contract and conversion in connection with Dakota Style's unpaid balance. Dakota Style acknowledges that it indeed has an outstanding balance of $641,083.92 with SunOpta, but invokes the right to set-off of damages to avoid paying this sum. Under SDCL 57A-2-717, a buyer "on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of

the price still due under the same contract." Comment 2 further provides that "no formality of notice is required and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient." However, the breach involved "must be of the same contract under which the price in question is claimed to have been earned." SDCL 57A-2-717 cmt. 1. SunOpta disputes that Dakota Style provided it with notice that it intended to set-off its damages. SunOpta also claims that set-off is inappropriate as it owes Dakota Style no damages. Whether Dakota Style provided SunOpta with notice that it intended to set-off its damages and whether Dakota Style has damages with which to set-off the amount it owes SunOpta are open questions of fact. Additionally, whether the damages Dakota Style sustained were under the same contract as its unpaid balance is also a question of fact. Summary judgment on this issue at this time is therefore inappropriate. SunOpta's complaint also requests set-off for any damages it owes Dakota Style of Dakota Style's outstanding balance. The same questions of fact apply to SunOpta's request.

## X. SunOpta's Breach of Contract, Unjust Enrichment, Promissory Estoppel, and Fraud Claims in Connection with its $253,889.00 Payment to Dakota Style

Dakota Style requests that this court enter summary judgment on SunOpta's claims in connection with its $253,889.00 payment to Dakota Style. SunOpta states, pursuant to an invoice received from Dakota Style, that it issued payment to Dakota Style for $253,889.00 via wire transfer to cover the cost of recalled sunflower products. SunOpta claims that it issued such payment based on an agreement with Dakota Style that Dakota Style would provide documentation substantiating that the payment was for actual recalled product and showing that the recalled product was destroyed or returned to SunOpta. SunOpta further states that Dakota Style has failed to provide such documentation. There are material questions of fact regarding the representations made during the agreement to remit this payment to Dakota Style and the

terms of the payment, to include whether Dakota Style agreed to provide documentation to SunOpta as SunOpta alleges, whether there were conditions on the refund, and whether the parties formed an oral contract with regard to the payment. Viewing these claims in the light most favorable to SunOpta, this court declines to grant Dakota Style summary judgment on any of SunOpta's claims in connection with the $253,889.00 payment.

## XI. Conclusion

In sum, this court declines to grant either Dakota Style's or SunOpta's requests for summary judgment.

### ORDER

Now, therefore,

IT IS ORDERED:

1. Plaintiff's motion for partial summary judgment, Doc. 28, is denied.

2. Defendant's motion for summary judgment, Doc. 34, is denied.

3. The requests for oral argument are denied.

Dated this _16th_ day of July, 2018.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge